Hedberg-Freidheim Contracting Company, (a corporation), Fred W. Hedberg and Chas. M. Freidheim, as Liquidating Trustees of Hedberg-Freidheim Contracting Company v. Commissioner. Hedberg-Freidheim and Company, (a corporation), Fred W. Hedberg and Chas. M. Freidheim, as Liquidating Trustees of Hedberg-Freidheim and Company, Petitioners v. Commissioner.
Hedberg-Freidheim Contracting Co. v. Commissioner
Docket Nos. 53629, 53630.
United States Tax Court
T.C. Memo 1956-275; 1956 Tax Ct. Memo LEXIS 16; 15 T.C.M. (CCH) 1433; T.C.M. (RIA) 56275; December 13, 1956
*16 Held: That petitioner Hedberg-Freidheim and Company did not accumulate its earnings or profits beyond the reasonable needs of its business during the years 1945-1948 and accordingly for those years is not liable for additional surtax under section 102, Internal Revenue Code of 1939. Held further: That petitioner Hedberg-Freidheim and Company did permit its earnings or profits to accumulate beyond the reasonable needs of the business and was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the years 1949-1952 and, accordingly, is liable for the surtax under section 102 for those years. Held further: That petitioner Hedberg-Freidheim Contracting Company permitted its earnings or profits to accumulate beyond the reasonable needs of its business and was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the years 1947-1952 and, accordingly, is liable for the surtax assessable under section 102 for such years. O. A. Brecke, Esq., McKnight Building, Minneapolis, Minn., for the petitioners. David Karsted, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: The respondent determined deficiencies in income taxes of petitioners as follows: Hedberg-Freidheim Contracting Co.
Docket No. 53629
Fiscal Year Ending
March 31
Deficiency
1947
$ 2,656.66
1948
2,143.01
1949
200.99
1950
4,600.09
1951
1,695.10
1952
3,539.46
Hedberg-Friedheim and Company
Docket No. 53630
1945
$ 1,339.46
1946
4,390.15
1947
32,871.70
1948
41,064.64
1949
25,501.00
1950
16,203.03
1951
14,957.76
1952
13,408.74
Respondent also determined deficiencies in the declared value excess profits and excess profits taxes of *18 the petitioner Hedberg-Freidheim and Company (Docket No. 53630) for the year 1946. By stipulation the parties have resolved their disputes in so far as such taxes are concerned and such agreement will be reflected in the Rule 50 computation. Of the several other adjustments made by the respondent, only one remains in dispute. The question for decision is whether either of the petitioners was formed or availed of during any of the taxable years in question for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed within the meaning of section 102, Internal Revenue Code of 1939. On July 2, 1953, proceedings for the dissolution of both petitioner corporations, out of court, were begun pursuant to the provisions of Chapter 301, Subdivision 47, of Minnesota Statutes Annotated, and other related sections. Fred W. Hedberg and Charles M. Freidheim were duly appointed as liquidating trustees in voluntary dissolution and are still serving in that capacity, and joined herein as petitioners on behalf of petitioner corporations. Findings of *19 Fact The stipulated facts are so found and are included herein by this reference. Petitioner Hedberg-Freidheim and Company (hereinafter referred to as Hedberg-Freidheim) is a corporation which was organized in 1922 under the laws of Minnesota. Its charter provided for a 30-year duration. During all the years in issue its income and excess profit tax returns were filed with the collector of internal revenue for the district of Minnesota. The original incorporators were Fred W. Hedberg, Charles M. Freidheim and C. L. Shol. The original capital put into the corporation by the incorporators was $28,200, for which 282 shares were issued. Hedberg and Freidheim bought out the Shol interest in 1929 and became the sole owners of the Company. The stock has been owned since 1929 as follows: Charles M. Freidheim
140 shares
Grace E. (Mrs. Charles M.) Freid-
heim
1 share
Fred W. Hedberg
140 shares
Dorothy E. (Mrs. Fred W.) Hedberg
1 share
Hedberg-Freidheim was engaged in the excavation and selling of sand and gravel. It also manufactured and sold concrete blocks. Its operations were located on the site of its St. Louis Park gravel pit in the Village of St. *20 Louis Park, Minnesota. Petitioner Hedberg-Freidheim Contracting Company (hereinafter referred to as Contracting) is a Minnesota corporation which was organized in 1929. In the organization of Contracting, Hedberg-Freidheim conveyed to Contracting a garage, garage equipment, and all of its trucks in exchange for all of Contracting's capital stock, 260 shares of which were issued to Hedberg-Freidheim and one qualifying share each to Hedberg and his wife and Freidheim and his wife. This stock ownership has remained the same. Thereafter Hedberg-Freidheim did not own any trucks and all the trucking for the business was done by Contracting. During all the years in issue Contracting's income tax returns were filed with the collector of internal revenue for the district of Minnesota. Each of the petitioner corporations kept its books and filed its returns for the taxable years on the basis of a fiscal year ending March 31. The officers of both Hedberg-Freidheim and Contracting since 1929 have been as follows: Fred W. Hedberg
President
Grace E. Friedheim
First Vice-President
Dorothy E. Hedberg
Second Vice-President
Charles M. Freidheim
Secretary-Treasurer
*21 These same individuals have constituted the board of directors of both corporations since 1929. Aside from the original capital invested by the incorporators in Hedberg-Freidheim no further stock was sold and the companies' borrowing has been confined to ordinary short-term bank loans. The growth of the business has been financed out of earnings being plowed back into the corporations. At the beginning of World War II Hedberg-Freidheim had purchased a new block plant and had constructed a ready-mix plan, which is a plant used for putting aggregate in concrete, mixing it and dumping it into trucks. Because of the lack of material during the war the block plant could not be set up until 1945. The ready-mix plant, however, was in operation during the war, but as neither petitioner had any special ready-mix trucks all trucking had to be done by a third party and the plant could not operate at full capacity. The sand and gravel business had changed during this period in that competition made it necessary that the supplier furnish ready-mix concrete rather than sand and gravel alone. During this period there had developed between Hedberg and Freidheim a certain amount of animosity *22 stemming from disputes concerning the amount of salary each should receive. Hedberg was the manager of both corporations and spent considerably more time supervising them than did Freidheim, who had outside real estate interests. They had previously agreed to a salary differential to compensate Hedberg for his services, but he was no longer satisfied. The parties had also disagreed on expansion and administrative policies of the two corporations. From 1941 through 1945 neither corporation was able properly to maintain its properties. Since they did not enjoy Government priorities they could not purchase new equipment, nor could they get enough spare parts for maintenance. Consequently, at the end of this period petitioners needed repairs and replacements. Furthermore, the sand and gravel supply at the St. Louis Park plant was becoming depleted and the Village would not allow excavation below water level. To supplement the depleted sand and gravel deposit at the St. Louis Park plant, Hedberg-Freidheim in July 1946 purchased at a cost of approximately $50,000 what is known as the Consolidated plant, located approximately five miles northwest of the St. Louis Park plant. The Consolidated *23 plant consisted of a gravel deposit and gravel plant. A block plant on the site of the Consolidated plant was leased by Hedberg-Freidheim, which lease expired in 1954. The screening plant and other equipment on this property was in need of repair. The minutes of a meeting of the board of directors of Hedberg-Freidheim held on December 28, 1946 are as follows: * * *
"The president stated that the purpose of the meeting was to discuss the purchase of a ready mix plant on the Great Northern Railway in downtown Minneapolis. Because the Hopkins [Consolidated] plant is also situated on the Great Northern Railway, it was thought that if this plant were also on the Great Northern right-of-way, the company would receive a lower freight rate. And because the company will need approximately $125,000.00 to purchase these ready mix trucks and plant, it would therefore not be advisable to declare any sizeable [sizeable] dividend for this year. "The president also stated that it would take approximately $20,000.00 to repair the plants and replace parts that they were unable to obtain during the war period. "The president also stated that due to the fact that they were very short of sand *24 for the ready mix plant, that it may be desirable to buy a half or all of the PERCY B. McGOWAN SAND AND GRAVEL plant, at 76th and France Avenue South. The cost would run approximately $50,000.00 to $75,000.00." * * *
The proposed purchase of the ready-mix plant was not consummated due to the difficulty in finding a site. However, from November 3, 1946 to February 1, 1947, Hedberg-Freidheim loaned and advanced to Percy McGowan, the owner and operator of a sand and gravel plant, amounts totalling $71,000, the major part of which was secured by a mortgage on McGowan's sand and gravel plant which was located about six miles southeast of the St. Louis Park plant. In return for the loans Hedberg-Freidheim made a favorable arrangement with McGowan for the purchase of sand and gravel. On February 1, 1947, McGowan Contracting Company, a corporation, was organized under the laws of the State of Minnesota. The capital contributed to the corporation consisted of the entire plant, machinery and equipment, together with a gravel pit owned by McGowan which was valued at $142,000 plus $5,000 in cash contributed by McGowan and $5,000 in cash contributed by Hedberg-Freidheim. In turn, 760 shares *25 of stock of the new corporation were issued to Hedberg-Freidheim and 760 shares were issued to McGowan. The indebtedness of $71,000 referred to above was released by Hedberg-Freidheim as part of the consideration for its stock. After the corporation was organized, McGowan became its manager. Hedberg-Freidheim was not satisfied with McGowan's performance of his duties and in the summer of 1947 Hedberg-Freidheim for $31,978.96 acquired the 760 shares of stock in the McGowan Contracting Company which had originally been issued to McGowan. From that time and through the years here in issue the officers of the McGowan Contracting Company have been the same as those of Hedberg-Freidheim. In 1947 a fire at the McGowan plant necessitated the construction of a new office and garage building. During the years 1945-1947 Hedberg-Freidheim had declared annual dividends of $8,000. At a meeting of the board of directors on February 7, 1948, the payment of an additional $16,000 dividend was discussed and so declared. The minutes of this meeting are as follows: * * *
"* * * It was unanimously agreed that in view of the expenditures required for the development of the added plant facilities *26 of the company and in view of the uncertainty of current business conditions no further dividends should be paid for the fiscal year ending March 31, 1948." * * *
During the year 1948 the dissension between Hedberg and Freidheim became progressively worse, arising mainly out of their disagreements concerning necessary expansion of the sand and gravel business. The animosity developed to such an extent that in the winter of 1948 the parties ceased speaking to each other and have not since resumed. On March 3, 1949, a special meeting of the board of directors of Hedberg-Freidheim was held in the offices of counsel for petitioners. At that meeting a motion was made by Hedberg in substance to the effect that the reasons for withholding the payment of larger dividends in the past (acquisition and development of additional properties and new facilities and to adjust the interests of the principal shareholders to prevent further dissension) no longer existed since the expansion had been completed and that the corporation should declare at once a dividend of $170,000. During the discussion which followed Hedberg read into the record a statement to the effect that he had been advised by *27 accountants and counsel for the company that if the corporation did not pay out in dividends as much as might reasonably be spared it might become liable for the section 102 surtax. At the close of the discussion Hedberg and his wife voted for, while Freidheim and his wife voted against, the motion. Consequently the motion did not carry. On the same day at a meeting of the board of directors of Contracting, Hedberg proposed a motion for a declaration of a $40,000 dividend, which motion stated substantially the same reasons for the declaration of the dividend as were stated in the Hedberg-Freidheim motion. Since Freidheim and his wife voted against this motion it also did not carry. On April 9, 1949, Hedberg brought an action in the state court against Hedberg-Freidheim asking for its involuntary dissolution. During May 1949, the following actions were initiated: Hedberg against Hedberg-Freidheim to recover $57,000 claimed as reimbursement of expenses advanced by Hedberg over a long period of years in connection with the business of the company; Hedberg against Hedberg-Freidheim to recover $23,400 as adjusted compensation (bonus); Hedberg-Freidheim against Freidheim to compel Freidheim *28 to convey to the company certain gravel land which he had purchased in his own name. Following the initiation of these actions Hedberg and Freidheim, acting mainly through third parties, attempted to find a solution to their difficulties. Hedberg wished to divide the assets of all three corporations while Freidheim felt that one of the parties should purchase the other one-half of the business. The main difficulty involved was their inability to arrive at a price for the St. Louis Park plant. In July 1949 an "auction" was held in the office of counsel for petitioners, between Hedberg and Freidheim to determine which one would be entitled to purchase the St. Louis Park plant. Hedberg's bid of $222,000 was greater than Freidheim's and accordingly he acquired the right to purchase the assets of the entire business. Subsequently, however, Hedberg refused to carry out the bargain because of his lack of cash and the tax consequences. On August 19, 1949, the action by Hedberg for dissolution of Hedberg-Freidheim was dismissed by the plaintiff. A meeting of the board of directors of Hedberg-Freidheim was held on September 1, 1949. The minutes of the meeting are as follows: * * * *29 "All of the directors met at the appointed time and Mr. Hedberg stated that the meeting had been called for the purpose of voting the payment of dividends. Mr. Freidheim stated that in view of pending litigation he was not ready to vote any dividends and that acting on that matter would have to be deferred until after September 15, 1949. "* * * the meeting was adjourned without any action being taken." Following this meeting and during the year 1950 the board of directors of Hedberg-Freidheim did not hold any meetings. Through the efforts of the attorneys of Hedberg and Freidheim a meeting was held on January 20, 1951. At this meeting Hedberg and Freidheim agreed on the following matters: Hedberg should continue as manager of the business until March 31, 1952; Hedberg should receive certain agreed bonuses; a dividend of $100 per share was voted; Hedberg-Freidheim should pay Hedberg $25,000 in full settlement of his suit for expenses and all other suits that were pending between the parties or the corporation should be dismissed with prejudice. It was also suggested by Freidheim that the corporation purchase seven or eight ready-mix trucks. Counsel for petitioners was instructed *30 to prepare minutes of the meeting embodying the terms of the agreement and the meeting was adjourned until January 22, 1951, when it was to reconvene for purposes of signing the minutes. When reconvened, Freidheim refused to sign the minutes. On April 18, 1951, Hedberg and his wife on behalf of Hedberg-Freidheim brought an action against Freidheim to determine the validity of the action taken by the directors at the meeting held January 20, 1951, and to restrain Freidheim from interfering with the carrying out of the corporate action authorized at the meeting. Order for judgment was rendered on November 9, 1951, determining that the action taken by the directors at the meeting of January 20, 1951, was valid and ordering that Freidheim be permanently restrained from interfering with the carrying out of the corporate action authorized at the said meeting. The order also restrained the further prosecution of an action for dissolution which Freidheim had instituted and ordered the dismissal of the remainder of the suits referred to above. The dividend of $100 per share was paid by Hedberg-Freidheim on April 16, 1951. The charter of Hedberg-Freidheim expired on April 2, 1952. On *31 April 16, 1952, Freidheim brought an action for the dissolution of Hedberg-Freidheim. On May 31, 1952, Hedberg and Freidheim entered into an agreement whereby the corporate existence of Hedberg-Freidheim was extended until April 1, 1954, provided that at any time after April 1, 1953, either of the parties could demand the dissolution. Around April 20, 1953, Freidheim notified Hedberg that he wished to effect the dissolution of Hedberg-Freidheim. Arbitrators were appointed pursuant to the terms of the 1952 agreement. They in turn divided the assets of the three corporations (Hedberg-Freidheim, Contracting, and McGowan) into two groups and each party selected the group of assets he wanted. On the first drawing Hedberg and Freidheim selected opposite groups, Hedberg getting the McGowan and Consolidated plants, while Freidheim selected the St. Louis Park plant. The business was divided up accordingly and the corporations were wound up on July 2, 1953. The comparative balance sheets and comparative statements of operating expenses for Hedberg-Freidheim and Contracting (Joint Exhibits 1-A to 4-D, inclusive) covering the years involved, are incorporated herein by reference. An analysis *32 of such exhibits reveals the following pertinent information: HEDBERG-FREIDHEIM
Excess of
Capital
Working
Expenditures
Capital
Annual
Over Annual
Less Depre-
Working
Operating
Operating
Dividends
Additions
ciation and
Capital
Expenses
Expenses
Paid
to Surplus
Depletion
1945
$121,466.48
$ 47,185.35
$ 74,281.13
$ 8,000.00
$ 7,479.65
$ 569.11
1946
155,120.64
56,078.82
99,041.82
8,000.00
25,421.94
2,805.11
1947
84,548.06
104,649.93
(20,101.87)
8,000.00
71,026.27
155,442.20
1948
119,676.01
138,599.83
(18,923.82)
24,000.00
55,903.80
25,561.04
1949
224,017.94
91,277.67
132,740.27
92,830.99
(14,897.61)
1950
299,153.88
86,688.47
212,465.41
59,020.20
(16,111.57)
1951
325,100.90
147,787.02
177,313.88
59,625.03
5,910.96
1952
361,392.20
140,991.44
220,400.76
28,200.00
20,474.85
13,096.46
CONTRACTING
1947
$120,763.93
$ 91,934.60
$ 28,829.33
$10,111.65
$ 3,297.43
1948
96,163.09
81,387.07
14,776.02
7,763.50
33,564.34
1949
91,512.14
86,771.06
4,741.08
1,423.89
8,146.94
1950
118,878.35
54,135.32
64,743.03
15,914.83
(11,451.38)
1951
126,632.10
73,759.35
52,872.75
5,158.33
( 1,661.75)
1952
99,894.42
88,384.75
11,509.47
12,197.99
40,552.69
*33 The respondent determined that petitioners Hedberg-Freidheim and Company and Hedberg-Freidheim Contracting Company had been availed of during the aforementioned years for the purpose of avoiding the surtax upon their shareholders within the meaning of section 102, Internal Revenue Code of 1939. The petitioner Hedberg-Freidheim and Company did not accumulate its earnings or profits beyond the reasonable needs of its business and was not availed of for the purpose of preventing the imposition of surtax upon its shareholders during the fiscal years ending in 1945 to 1948, inclusive. The petitioner Hedberg-Freidheim and Company did permit its earnings or profits to accumulate beyond the reasonable needs of its business and was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the fiscal years ending in 1949 to 1952, inclusive. The petitioner Hedberg-Freidheim Contracting Company permitted its earnings or profits to accumulate beyond the reasonable needs of its business and was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the fiscal years ending in 1947 to 1952, inclusive. *34 Opinion The only issue left for decision herein is whether either of the petitioners is liable for the surtax assessable under section 102, Internal Revenue Code of 1939. [1]A corporation becomes liable for the section 102 surtax if it is formed or availed of for the purpose of avoiding the surtax upon its shareholders through the medium of accumulating earnings or profits. Respondent does not contend that either of the petitioners was formed for the condemned purpose, but does contend that each was so availed of during the years in issue. The petitioners do not dispute that the accumulations of earnings or profits in the amounts indicated in the tables set forth in our findings occurred during the period in question. *35 Section 102(c) provides that the fact that the earnings or profits were permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation shall prove to the contrary by a clear preponderance of the evidence. What the reasonable needs of a business are is a question of fact which must be determined from the evidence as a whole. Helvering v. Chicago Stock Yards Co., 318 U.S. 693. Accumulations of earnings or profits by a corporation for purposes of expansion are clearly for a legitimate business need. Crawford County Printing & Publishing Co., 17 T.C. 1404. Working capital is also a necessary business requirement and it has been held that the accumulation of earnings or profits sufficient to meet the operating expenses of a corporation for at least one year is not unreasonable. J. L. Goodman Furniture Co., 11 T.C. 530. Cf. World Publishing Co. v. United States, 104 Fed. Supp. 784. In determining whether accumulations of earnings or profits in a particular year are within the reasonable business needs of a corporation, however, it *36 is necessary to take into account prior accumulations, since such accumulations prior to the year involved may have been sufficient to cover the business needs and additional accumulations during the year involved would not reasonably be necessary. See World Publishing Co. v. United States, 72 Fed. Supp. 886, affd. 169 Fed. (2d) 186; Gus Blass Co., 9 T.C. 15. Hedberg-Freidheim For the fiscal year ending in 1945 Hedberg-Freidheim had an excess working capital of approximately $74,000; for 1946, approximately $99,000. However, for each of the years 1947 and 1948 the working capital of the corporation was approximately $20,000 less than the operating expenses for those years. The circumstances dictate that the years 1945-1948 be considered together. It was during the last two years of this period that the corporation did its expansion for which its accumulations had been made in 1945 and 1946. Section 102 does not require that a corporation must either distribute its earnings or make its expansion during the year of accumulation. Reasonable accumulations of earnings or profits may be made over a period of years for contemplated future expansion. *37 See Crawford County Printing & Publishing Co., supra.It is significant that in 1947 and 1948, when the corporation made its large capital expenditures and when the contemplated expansion was consummated, the prior excess of working capital over annual operating expenses was wiped out and there was actually an insufficient amount of working capital. Thus, without the accumulations during this period the petitioner would have been unable to finance its expansion out of earnings as it had always done in the past. Accordingly we find that the accumulations of earnings or profits during the corporation's fiscal years 1945-1948 were not beyond the reasonable needs of the business and that petitioner was not availed of for purposes of avoiding the surtax upon its shareholders within the meaning of section 102, during these years. Respondent has emphasized on brief the lack of evidence introduced showing that the petitioner had any definite plan for expansion, particularly during the first two years of this period. This argument is not persuasive in view of the subsequent expansion. Cf. *38 Coca-Cola Bottling Works v. United States, 53 Fed. Supp. 992. By March 31, 1948, however, the Hedberg-Freidheim expansion was almost finished. The dissension between the two principal shareholders prevented further major action. In the fiscal year 1949 the company had net earnings after taxes of $92,830.99. Its working capital had increased until it was $132,740.27 in excess of its annual operating expenses. Hedberg favored the declaration of a dividend by the corporation but Freidheim opposed it and no dividend was declared. Although the minutes of the meeting do not disclose Freidheim's reasons for voting against the dividends, he testified that such action was prompted by the following considerations: (1) there was a need for the further improvement of the assets of the business; (2) if the dissension between the parties forced a split-up, all of the surplus would be needed by the corporation to buy up and retire the stock of one of the shareholders; or (3) in the event a division of the assets was required, the liquid assets of the corporation would be necessary to pay the capital gains taxes which would be assessed against the shareholders upon distribution of the *39 assets. These reasons do not convince us that the accumulations were not beyond the reasonable needs of the business. While, as pointed out above, a corporation may accumulate earnings for purposes of expansion and modernization, in the instant case Freidheim admitted that the plans which he mentioned at the hearings existed only in his mind during the year 1949, and due to the wrangling between himself and Hedberg there was only a faint hope that such expansion might be carried out sometime in the future. Indefinite and nebulous plans for expansion are not sufficient to prevent the imposition of the section 102 surtax. See KOMA, Inc. v. Commissioner, 189 Fed. (2d) 390, affirming a Memorandum Opinion of this Court [8 TCM 1064,]; Bride v. Commissioner, 224 Fed. (2d) 39, affirming a Memorandum Opinion of this Court [12 TCM 1230]; Gus Blass Co., supra. Petitioner relies upon Gasette Publishing Co. v. Self, 103 Fed. Supp. 779, and Dill Manufacturing Co., 39 B.T.A. 1023, in support of the contention that Freidheim's second reason was a valid business purpose for the accumulation of earnings. *40 Those cases are distinguishable. In both Gazette and Dill the corporation used accumulated funds to buy the stock of a disgruntled minority shareholder, while here Freidheim and Hedberg each owned one-half of the business. Furthermore, in the instant case, it is clear that Hedberg intended to remain in the sand and gravel business and would not sell his stock to the corporation. Therefore, in any retirement plan which might have been carried out, Freidheim's stock would have been retired. It follows that Freidheim's refusal to allow the distribution of a dividend was not prompted by any consideration of business needs of the corporation but rather to accomplish his personal desire to have his stock retired and leave the corporation. Freidheim's third reason is likewise without merit. We can conceive of no corporate business purpose in accumulations which were intended to facilitate the payment of capital gains taxes of shareholders. In September 1949, Freidheim again refused to vote for a dividend because of the "pending litigation," consisting of the suits by Hedberg against the company. In view of the fact that the corporation had excess working capital at the end of this fiscal *41 year amounting to $212,465.41 and that $80,400 was the maximum liability it might suffer under the pending lawsuits (later settled for approximately $24,000), it does not appear that the reasonable needs of the business required any further accumulation of earnings. Cf. Bride v. Commissioner, supra, affirming without discussion of this point, a Memorandum Opinion of this Court. At the next meeting of the petitioner's board of directors, held during the fiscal year ending in 1951, a dividend of $28,200 was declared, but was not paid until after the close of the fiscal year. During this year, the corporation added $59,625.03 to surplus, while its net capital expenditures amounted to only $5,910.96. No additional reasons were given at the hearing for this accumulation. The fact that the corporation was facing dissolution in the near future does not prevent the imposition of section 102. One of the purposes for which section 102 was enacted was to prevent tax avoidance through subsequent liquidation and distribution of unreasonable accumulations. During the fiscal year 1952, the corporation had excessive working capital amounting to $220,400.76. It added $20,474.85 to *42 surplus while making net capital expenditures of only $13,096.46. Our previous discussion covers all of the reasons advanced for this accumulation. We hold that for the fiscal years ending in 1949-1952 petitioner Hedberg-Freidheim accumulated earnings or profits beyond the reasonable needs of its business and failed to prove by the clear preponderance of the evidence that such accumulations were not for the purpose of avoiding the surtax upon its shareholders. Accordingly, for those years the surtax assessable under section 102 was properly imposed. Contracting Very little of the testimony at the hearing was directed toward the determination of the reasonable needs of Contracting. It is a taxable entity and, so far as section 102 is concerned, must stand on its own feet. See Latchis Theatres of Keene, Inc., 19 T.C. 1054, affd. 214 Fed. (2d) 834. Section 102 applies to Contracting even though all but four of its shares were held by Hedberg-Freidheim. See Regulations 111, § 29.102-1. At the end of 1947, the first year in issue with respect to it, Contracting had excess working capital of $28,827.33. During the period in issue petitioner plowed back *43 into the business almost $20,000 more than it added to surplus. However, during all these years the corporation had an excess of working capital over operating needs and could have carried out its expansion program and still have paid a dividend. Since petitioner has failed to sustain the burden of proving that the entire accumulation was necessary during any of the years in issue, we hold that such accumulations were beyond the reasonable needs of the business. Petitioner has also failed to prove by a clear preponderance of the evidence that such earnings were not accumulated with intent to evade the surtax upon its shareholders. Accordingly, the respondent's determination is sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 27 1/2 per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 38 1/2 per centum of the undistributed section 102 net income in excess of $100,000. * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. * * *↩